IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| JAMES TRAVIS MOORE, | ) | |
|     Petitioner, | ) | Civil Action No. 7:20cv738 |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| HAROLD W. CLARKE, | ) | By:   Hon. Thomas T. Cullen |
|     Respondent. | ) |         United States District Judge |

James Travis Moore ("Moore" or "Petitioner"), a Virginia inmate proceeding *pro se*, filed a petition for writ of habeas corpus under 28 U.S.C. § 2254, challenging his 2017 convictions for first-degree murder and use of a firearm in the commission of a felony based on perceived ineffective assistance of counsel at trial. The respondent, Harold W. Clarke, has filed a motion to dismiss. As explained below, Moore has failed to establish a substantial claim, as is required to overcome his failure to raise ineffective assistance of counsel in the Supreme Court of Virginia. The court will therefore grant the motion to dismiss.

## I. Factual Background and Procedural History

On July 17, 2014, Moore was arrested for the murder of Noel Navarro-Peña. Following a preliminary hearing on March 20, 2015, the matter was certified to the grand jury. CCR at 23.[1] A grand jury later returned an indictment charging Moore with two counts of first-degree murder and two counts of using a firearm in the commission of a felony. During a two-day jury trial held in December 2016, the following evidence was presented. That evidence is summarized in the light most favorable to the Commonwealth, the prevailing party.

---

[1] All citations to the Circuit Court Record of *Commonwealth v. Moore*, Nos. CR15-493 and CR15-494 (Henry County Circuit Court), will be abbreviated "CCR," using the page numbers in the lower right corner.

On June 27, 2014, a citizen discovered an abandoned pick-up truck partially off Daniel Road in Henry County and notified police. A body was later discovered inside the cab. Investigators identified the victim as Alfonso Navarro-Peña ("Alfonso") and determined that he had died from a single gunshot wound. CCR at 217.

Early the next morning, Gary Helmick drove into the Smith River Sports Complex in Axton, Virginia, and discovered a body lying on the ground next to another pick-up truck. This body—later identified as Noel Navarro-Peña ("Noel"), Alfonso's younger brother—had a gunshot wound in the chest and another in its head. CCR at 207. Helmick immediately called the police. Video footage from a camera on a maintenance building near the entrance of the Sports Complex showed a gray Toyota Camry entering the complex at 9:54 p.m. on June 27 and leaving at 9:57 p.m. Several days later, a grounds worker located an expended bullet near where Helmick found Noel's body.

The jury heard that, following the discovery of the Peña brothers' bodies, police interviewed Johnny Rivera-Olvera about the crimes because his phone number appeared in the cell phones of both victims as one of their last phone calls. Olvera admitted at trial that he made several different and conflicting statements to the officers about what happened.[2] Ultimately, however, Olvera identified "Travis" as the shooter. Olvera testified that he set up meetings between Travis and each brother, ostensibly to repay money owed, and that he was present when Travis shot each victim. Olvera did not know Travis's last name, but told the

---

[2] In one of the statements Olvera made to police, he said "I did it." That information was not presented at trial.

officers where Travis lived. Later, he identified a photo of Moore as the person he knew as "Travis."

Based on Olvera's statements and Moore's car appearing similar to the car in the video at the Sports Complex, the jury heard that officers obtained a search warrant for Moore's home. *Id.* at 21. During execution of the warrant at Moore's home on July 17, 2014, police recovered a silver .38 caliber handgun loaded with five rounds of ammunition in a bedroom dresser and a box of Remington .38 special cartridges (with four spent cartridge casings inside) in another bedroom. *Id.* Moore acknowledged ownership of the gun and admitted that he and Rivera-Olvera had driven to the Sports Complex on June 27, but he denied any involvement in the murders. *Id.*

At trial, Olvera testified that he and Moore both sold drugs for the Peña brothers and that they both owed the brothers money. According to Olvera, he owed Noel $1000 for a personal loan, but Moore owed approximately $11,000 for drugs. According to Olvera, on the morning of his death, Noel had asked Olvera to talk to Moore about his debt. When Olvera did, Moore responded that he had $9500 that he could pay. Olvera testified that he then called Noel and arranged for Moore to drop off the money. Trial Tr. at 264–268, Dec. 6, 2016 [ECF No. 18-5]. Around 9:00 p.m. that evening, Moore picked Olvera up from his home, and they drove towards Noel's home in Moore's gray Toyota Camry. Before they arrived, however, Noel called Olvera and asked to meet them at the Sports Complex instead, which they did. Noel was not there when they first arrived, so they went to a convenience store and returned a short time later. *Id.* at 272–274.

Olvera testified that when he and Moore returned, Noel was standing beside his red truck, waiting. Moore got out of the car and told Noel that he wanted to talk about the money he owed him. Olvera testified that after Moore got out of the car and approached Noel on foot, Olvera moved over to the driver's seat and drove further into the complex. As he did, Olvera testified that he heard two or three gunshots coming from the direction where he had left Moore and Noel. Olvera recalled that after he turned the car around and drove back towards the two men, he saw Noel lying on the ground. *Id.* at 275–278. When Moore got back in the car, Olvera noticed that he was holding a silver gun "similar to a .38." *Id.* at 278. When he asked Moore what happened, Olvera testified that Moore "told [him] that he had paid his debt. And anyhow, [Moore] wasn't going to permit people like [Noel] to harm his family." *Id.* at 279. According to Olvera, Moore then asked him to call Alfonso and set up a meeting with him. Although Olvera testified that he did not want to arrange the meeting, he was scared that Moore might shoot him if he did not cooperate. *Id.* at 280–281. He called Alfonso and arranged for Moore to meet him behind an abandoned building near a junkyard. *Id.* at 282–283.

When Olvera and Moore got to the rendezvous point, Alfonso had not yet arrived; he pulled in just a few moments later. Moore got out of the car, and Olvera testified that he heard one gun shot. When Moore returned to the car, he was holding the same silver gun in his hand. Moore told Olvera, "I knew what I had to do." *Id.* at 286.

The medical examiner testified that Noel's time of death was 10:25 p.m. Wendy Gibson—from the Virginia Department of Forensic Science—testified that ballistics comparison established that the bullet found in the Sports Complex had been fired from the

.38 caliber handgun recovered from Moore's dresser, as had the metal jacket surrounding the bullet that had lodged in Noel's head. No similar forensic evidence was available regarding Alfonso's death, nor was there any video evidence placing Moore's car on Daniel Road where Alfonso's body was recovered.

Moore took the stand in his own defense. Consistent with his earlier statement to police, Moore testified that he and Olvera had driven into the Sports Complex, but he denied that he sold drugs for the Peña brothers and denied seeing either of them that night, much less killing them.

After deliberations, the jury found Moore guilty of the first-degree murder of Noel Navarro-Peña and use of a firearm in that crime, but it acquitted him of the charges related to the murder of Alfonso Navarro-Peña. CCR at 479–482. The jury recommended the minimum sentence of 20 years for the murder and the mandatory three years for use of a firearm. Following consideration of a presentence report and evidence presented at a sentencing hearing on March 1, 2017, the court sentenced Moore in accordance with the jury's recommendation—23 years imprisonment. The final Order was entered on April 3, 2017. CCR at 532–533.

Moore appealed his conviction to the Court of Appeals of Virginia, arguing that the evidence was insufficient to support his conviction; the court denied his appeal. *Moore v. Commonwealth*, No. 0624-17-3 (Va. Ct. App. Nov. 1, 2017). The Supreme Court of Virginia refused his petition on July 2, 2018. *Moore v. Commonwealth*, No. 171614 (Va. July 2, 2018). Moore did not petition the United States Supreme Court for certiorari.

On May 21, 2019, Moore filed a petition for writ of habeas corpus in the Supreme Court of Virginia, alleging that the prosecutor had violated his *Brady*[3] rights by withholding exculpatory evidence, including prior statements Olvera had made to investigators from the Henry County Sheriff's Office, agents from Homeland Security, and other inmates at the jail that *he* shot one or both victims. Moore further alleged that his trial counsel was ineffective for failing to raise these alleged *Brady* violations. After the government filed a motion to dismiss Moore's state petition (accompanied by evidence that the material *had*, in fact, been provided to defense counsel), Moore filed a motion on September 11, 2019, seeking leave to amend his state habeas petition to add additional ineffective-assistance-of-counsel claims. Moore asserted that he first learned that the Commonwealth Attorney had provided the information to defense counsel when the Commonwealth responded to his state petition. The court denied the motion to amend by order dated October 8, 2019. In an opinion dated July 7, 2020, the court dismissed Moore's habeas petition, finding that no *Brady* violation had occurred because the material had been provided to the defense. It based this conclusion on the correspondence provided by the government and Moore's counsel's cross-examination of Olvera regarding the content of those statements.

On November 12, 2020, Moore filed the current petition under § 2254, alleging that his trial counsel was ineffective for failing to cross-examine Olvera about Olvera's prior statements that he "did it."

---

[3] In *Brady v. Maryland*, 373 U.S. 83 (1963), the Supreme Court held that a criminal defendant has a right to have material, potentially favorable evidence in the prosecution's possession disclosed to the defendant before trial.

## II. Standard of Review and Limitations on Federal Habeas

Federal courts reviewing constitutional claims adjudicated on the merits in state court may grant relief on such a claim only if the state court's decision was (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)–(2).

A federal district court reviewing a § 2254(a) petition is also limited in its review by the doctrines of exhaustion, procedural default, and independent and adequate state law grounds. The standard of review and these procedural doctrines promote the principles of finality, comity, and federalism, recognizing a state's legitimate interests in enforcing its laws, preventing disruption of state judicial proceedings, and allowing states the first opportunity to address and correct alleged violations of a state prisoner's federal rights. *Coleman v. Thompson*, 501 U.S. 722, 730–31 (1991).

A. Exhaustion

A habeas petitioner is required to exhaust his claims in state court before they can be considered in federal court. 28 U.S.C. § 2254(b)(1)(A). To exhaust his claims, a petitioner must present his federal constitutional claims to the highest state court, on the merits, before he is entitled to seek federal habeas relief. *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999). Further, the petitioner must present to the state court the same operative facts and the same controlling legal principles that he seeks to present to the federal court. *Duncan v. Henry*, 513 U.S. 364, 365–66 (1995); *Kasi v. Angelone*, 300 F.3d 487, 501–02 (4th Cir. 2002). Failure to do so

"deprives[s] the state courts of an opportunity to address those claims in the first instance." *Coleman*, 501 U.S. at 732.

B. <u>Procedural Default</u>

A separate but closely related issue is the doctrine of procedural default. If a state court has clearly and explicitly denied a petitioner's claim based on a state procedural rule that provides an independent and adequate ground for the state court's decision, the claim is procedurally defaulted for purposes of federal habeas review. *Breard v. Pruett*, 134 F.3d 615, 619 (4th Cir. 1998). A state procedural rule is independent if it does not depend on a federal constitutional ruling, and it is adequate if it is firmly established and regularly applied by the state court. *Yeatts v. Angelone*, 166 F.3d 255, 263–64 (4th Cir. 1998). A claim that has not been presented to the highest state court but would be procedurally barred as untimely or successive if the petitioner tried to present the issue to the state court now is considered simultaneously exhausted and defaulted. *Bassette v. Thompson*, 915 F.2d 932, 936–37 (4th Cir. 1990).

C. <u>Overcoming Procedural Default</u>

For a federal court to consider the merits of a procedurally defaulted claim in a habeas petition, the prisoner must show both cause for the default and actual prejudice as a result of the claimed federal violation. *Coleman*, 501 U.S. at 750. Cause for procedural default requires the existence of some objective factor that is external to the defense and not fairly attributable to the prisoner. *Id.* at 756–57. To show prejudice to overcome procedural default, a petitioner must show that the claimed violation worked to his "actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *United States v. Frady*, 456 U.S. 152, 170 (1982).

When a petitioner seeks federal relief for a defaulted claim of ineffective assistance of counsel at his trial, the federal court applies a special test for "cause and prejudice." Specifically, a federal habeas petitioner must establish four elements: (1) the claim of ineffective assistance of trial counsel is a "substantial claim;" (2) the "cause" is the lack of counsel or ineffectiveness of counsel under the standards of *Strickland v. Washington*, 466 U.S. 668 (1984); (3) the state post-conviction proceeding was the first time ineffective assistance of counsel was raised; and (4) the state post-conviction proceeding was the first one in which petitioner was actually or effectively allowed by state law to raise the claim. *Trevino v. Thaler*, 569 U.S. 413, 423 (2013); *Martinez v. Ryan*, 566 U.S. 1, 13–15 (2012); *Owens v. Stirling*, 967 F.3d 396, 422–23 (4th Cir. 2020). Even if a claim has merit, a petitioner is not necessarily entitled to relief; a substantial claim merely allows the federal court to consider the merits of an otherwise-defaulted claim. *Id.* at 17.

### III. Analysis of Claim

In the present case, the Supreme Court of Virginia never considered Moore's claim of ineffective assistance of counsel because the court denied Moore's motion to amend his state habeas pleading. Even if the court had permitted the amendment, however, it would not have considered the claim because it was untimely. *See Juniper v. Warden of Sussex I State Prison*, 470 S.E.2d 290, 295–96 (Va. 2011) (holding that claims filed after the statute of limitations has run are untimely, even when leave had been granted to file an amended petition). Moore filed his motion to amend his petition on September 11, 2019, but by that time, the state statute of limitations had expired. *See* Va. Code § 8.01-654(B). To be timely, Moore would have had to file his motion to amend his state petition on or before July 2, 2019 (one year from the

conclusion of his direct appeal). *See* Va. Code Ann. § 8.01-654(B). The motion to amend the petition was not filed until September 11, 2019, meaning his claim would be untimely under Virginia law and therefore procedurally barred. Because the claim was not timely raised in the state court, under the state's independent and adequate state law on timeliness, it is now considered simultaneously exhausted and defaulted. *Bassette*, 915 F.2d at 936–37.

Although Moore's ineffective assistance of counsel claim is defaulted, the court may nevertheless consider the merits of that claim if Moore can satisfy *Martinez*'s cause-and-prejudice test. In Virginia, claims of ineffective assistance of counsel cannot be raised on direct appeal; state post-conviction proceedings are the first opportunity for a petitioner to raise them. *Lenz v. Commonwealth*, 544 S.E.2d 299, 304 (Va. 2001). In his original state habeas petition, Moore raised ineffective assistance of counsel for failing to object to *Brady* violations. If Moore had had an attorney at his state post-conviction proceedings, the attorney would have been able to ascertain quickly that there were no *Brady* violations, allowing Moore to make a timely claim that his trial counsel was ineffective for failing to use the available *Brady* material effectively on cross examination of Olvera. Therefore, the cause for default appears to be that Moore did not have counsel in his state habeas proceeding. As a result, Moore's § 2254 petition stands or falls on whether his claim for ineffective assistance of counsel is a "substantial claim," meaning that it has some merit. *Martinez*, 566 U.S. at 14.

To determine whether Moore's claim for ineffective assistance of counsel has merit, the court must consider what a petitioner would have to show to prevail on such a claim. To establish a claim for ineffective assistance of counsel, a petitioner must show (1) that counsel's performance was so deficient that he was not functioning as counsel guaranteed by the Sixth

Amendment *and* (2) that the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). A petitioner must satisfy both prongs of the test in order to prevail.

Deficient performance requires a showing that counsel's performance fell below "an objective standard of reasonableness . . . under prevailing professional norms." *Id.* at 688. The reviewing court must not rely on "the distorting effects of hindsight," but must presume that counsel's decisions and actions fell within the wide range of reasonable strategy decisions. *Id.* at 689–90. The benefit of the doubt must be given to the defense attorney. *Woods v. Etherton*, 136 S. Ct. 1149, 1151 (2016). And counsel is given wide latitude to make strategic decisions, including what objections to make, what witnesses to call, and what arguments to make; such decisions require knowledge of the rules of evidence and procedure, along with tactical considerations that may be difficult to explain to a layperson. *Gonzalez v. United States*, 553 U.S. 242, 249 (2008). Cross-examination of witnesses falls within the scope of these strategic decisions. *Hunt v. Nuth*, 57 F.3d 1327, 1333 (4th Cir. 1995). Unless a cross-examination strategy is so egregious that it falls outside the prevailing professional norms of reasonableness, then there is no deficient performance. *Id.*

At trial, Moore's attorney elicited impeachment testimony that Olvera was also charged with the murders of Alfonso and Noel; that he had made several prior inconsistent statements about what happened and who was present; that he had changed his story to try to tell the police what they wanted to hear; and that he had a motive to lie to help himself. For example, the following exchange on cross-examination reveals the way in which counsel established that Olvera had previously lied to investigators:

> Q. Do you recall when you were first interviewed, you were interviewed by Inv. Hambrick and two agents from the Department of Homeland Security?
>
> A. Yes sir.
>
> Q. And you remember initially telling them about the three black men?
>
> A. Yes sir.
>
> Q. Then it went from three black men to one black man?
>
> A. Like I said at the time, I only said that because I wanted my wife released.

Trial Tr. at 316. Contrary to Moore's assertions in the present petition, his trial counsel's utilization of Olvera's prior inconsistent statements was not outside the "prevailing professional norms" so as to violate Moore's constitutional right to counsel.

Moore's counsel also elicited testimony that Olvera was the only person who had spoken to Noel and Alfonso to arrange the meetings where they were killed. *Id.* at 310. Olvera admitted, under cross examination, that police found 14 grams of cocaine, scales, and guns in his home, and that he had not been charged for any of those things. Trial Tr. at 302–304. Indeed, Moore's counsel sufficiently challenged Olvera's credibility such that the jury *acquitted* Moore of Alfonso's murder, which, unlike Noel's murder, was based almost exclusively on Olvera's testimony. In sum, the trial record reveals that Moore's counsel adequately undermined the credibility of Olvera's testimony.

Moore nevertheless argues that his counsel should have done more—specifically, that he should have tried to have Olvera concede that he had initially admitted to both murders. At bottom, Moore's criticisms amount to "grading the quality of counsel's cross-examination."

*Hunt,* 57 F.3d at 1333. After Olvera had been impeached, additional impeachment would have been cumulative, and there is no prejudice from failing to use cumulative impeachment questions. *Id.* At most, Moore's argument suggests that he did not receive the best possible representation at trial. But *Strickland* requires reasonable representation, not perfection. As the Fourth Circuit noted in *Hunt*:

> Although [petitioner] persuasively argues that he did not receive the *best* possible representation at trial, *Strickland* only requires adequate counsel judged by a standard of reasonableness in the light of prevailing norms of practice.

*Id.* Moore's trial counsel easily met that standard through his vigorous cross examination and effective impeachment of Olvera. That his attorney could have done even more on cross examination is not determinative; on this record, the court concludes that his handling of the Commonwealth's main witness was not constitutionally deficient.

But even if Moore could establish deficient performance, he cannot prove prejudice under *Strickland.* To establish prejudice, a petitioner must show that there is "a reasonable probability sufficient to undermine confidence in the outcome," or that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694; *see also United States v. Higgs,* 663 F.3d 726, 735 (4th Cir. 2011). Olvera had been impeached with prior inconsistent statements, his motive to lie, and his personal involvement in the crime. That the jury acquitted Moore of the second murder charge that depended almost entirely on Olvera's testimony conclusively demonstrates that his trial counsel impeached this key witness effectively.

Ultimately, given Moore's ownership and possession of the gun that fired the fatal shots into Noel, the video of his car at the Sports Complex less than 30 minutes before the

murder, and his admission that he had been at the scene with Olvera, the court cannot conclude as a matter of law that that this additional impeachment of Olvera would have made any difference in the outcome. Even if the jury heard that Olvera previously said, "I did it," the ballistic evidence, the video, and Moore's own admissions prevent the court from finding that additional impeachment of Olvera had a reasonable probability of producing a different result *as to Noel's murder*. As the Fourth Circuit concluded when it found no prejudice from failing to introduce testimony of five witnesses to impeach a codefendant-turned-prosecution witness, "Even if fully credited, this testimony indicates only that [the witness] may have been a more willing participant than he admitted. It does little, if anything, to undermine [the witness's] testimony as to [the defendant's] participation in the murders." *Huffington v. Nuth*, 140 F.3d 572, 581–82 (4th Cir. 1998). Such is the case here, and the court has ample confidence in the decision reached by the jury.

Because Moore cannot prove defective performance or prejudice, his claim is not substantial, and the court will not consider his procedurally defaulted ineffective-assistance-of-counsel claim.

## IV. Conclusion

For the reasons stated above, the court will grant the respondent's motion to dismiss.

Further, when issuing a final order adverse to a § 2254 petitioner, the court must issue or deny a certificate of appealability. Fed. R. Gov. § 2254 Cases 11(a). A certificate of appealability may only issue if the movant has made a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2). The movant must show that reasonable jurists could debate whether the petition should have been resolved in a different manner or that the

issues presented were adequate to deserve encouragement to proceed further. *Miller-El v. Cockrell*, 537 U.S. 322, 338 (2003); *Slack v. McDaniel*, 529 U.S. 473, 483–84 (2000). In the context of a procedural ruling, the movant must demonstrate both that the dispositive procedural ruling is debatable and that the action states a debatable claim of the denial of a constitutional right. *Gonzales v. Thaler*, 565 U.S. 134, 140–41 (2012). Moore has not made such showings in this case.

The clerk is directed to send copies of this Memorandum Opinion and accompanying Order to the parties.

**ENTERED** this 10th day of January, 2022.

*/s/ Thomas T. Cullen*
HON. THOMAS T. CULLEN
UNITED STATES DISTRICT JUDGE